**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1372**

---

CENTER FOR EXCELLENCE IN HIGHER EDUCATION, INC.,

Plaintiff - Appellant,

v.

ACCREDITATION ALLIANCE OF CAREER SCHOOLS AND COLLEGES,
d/b/a Accrediting Commission of Career Schools and Colleges,

Defendant - Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Rossie David Alston, Jr., District Judge. (1:22-cv-01223-RDA-WEF)

---

Argued: December 9, 2025                              Decided: February 5, 2026

---

Before DIAZ, Chief Judge, and WYNN and HARRIS, Circuit Judges.

---

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Diaz and Judge Harris joined.

---

**ARGUED:** David Aleksander Obuchowicz, GOMBOS LEYTON, PC, Fairfax, Virginia, for Appellant. Michael Randolph Shebelskie, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Lewis F. Powell, III, HUNTON ANDREWS KURTH LLP, Richmond, Virginia, for Appellee.

---

WYNN, Circuit Judge:

We generally defer to approved accreditation agencies in deciding whether a university deserves accreditation. When that accreditation decision is affirmed by an arbitrator, our review is doubly deferential.

In this case, an agency withdrew the accreditation of an online university. An arbitrator then affirmed that withdrawal. Trying its luck in district court instead, the university then unsuccessfully sought to overturn that decision—through both a motion to vacate and a complaint.

Deferring to the arbitrator, who himself deferred to the accreditation agency, we affirm.

## I.

## A.

To receive federal funding (and thus, realistically, to survive), an educational institution must be accredited. *See* 20 U.S.C. § 1002(b)(1)(A); *Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Schs., Inc.,* No. 1:08-cv-1186, 2009 WL 742532, at *1 (E.D. Va. Mar. 18, 2009). However, the federal government does not accredit educational institutions directly. Instead, the government has outsourced accreditation to private groups. *See* 20 U.S.C. § 1099b. One such group is the Defendant, Accreditation Alliance of Career Schools and Colleges ("the Alliance"). The Alliance's Standards of Accreditation set minimum standards for graduation and employment rates as benchmarks for accreditation.

2

Plaintiff, the Center for Excellence in Higher Education ("CEHE"), at one time operated several schools accredited by the Alliance. In 2018, after several years of complaints against CEHE's member schools, the Alliance placed the CEHE system on probation for a persistent failure to meet its benchmarks. The Alliance faulted CEHE for "widespread and persistent below-benchmark rates of graduation and employment" and questioned "whether the CEHE system of schools is misaligned with [the Alliance]'s mission and purpose to an irremediable extent." J.A. 206–07.[1]

The Alliance gave CEHE until September 7, 2020, to remedy its noncompliance. However, the Alliance reminded CEHE that it was "under no obligation to wait for the maximum timeframe to expire and may take an adverse action prior to the expiration of the maximum allowable timeframe." J.A. 72.

Once on probation, CEHE spent roughly $10 million on certain initiatives to bring its member schools into compliance, suspended enrolling new students in its in-person institutions, and eventually shifted all new enrollments to a single, online school, Independence University ("IU").

Throughout the probationary period, the Alliance issued three different orders that continued the probation: in May 2019, October 2019, and July 2020. Each asked for more information but ultimately concluded that CEHE was still out of compliance with the Alliance's accreditation standards.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

The July 2020 order noted that the Alliance was "concerned about the magnitude of improvement required to demonstrate compliance with accrediting standards, in context of the schools' maximum timeframe to remain on Probation." J.A. 135. For example,

> [o]f particular concern is that IU continues to report below-benchmark rates of student achievement. Of the 13 active (non-discontinued) programs that have been operational long enough to be reportable, the school has reported above-benchmark rates of student achievement for only four. The rates reported for the other nine will require significant improvements in order to achieve acceptable rates. The lack of significant improvement over the last three years calls into question the depth of assessment the school has conducted, and therefore does not provide assurance that the current plans will have the needed impact on rates of student achievement.

*Id.* The Alliance also warned that "[i]f the school does not bring itself into compliance within the period specified . . . , the [Alliance] will be obligated to take adverse action." *Id.* However, recognizing that "the focus and operational status of the school system has altered drastically since [the Alliance's] review in September 2019" because of CEHE's strategic decision to shift to fully online education, J.A. 133, the Alliance extended the timeframe to comply to May 31, 2021.

On December 30, 2020, CEHE responded one final time, this time with a 3,578-page action plan, complete with projected future graduation rates at IU. But on April 22, 2021, the Alliance informed CEHE that it was officially withdrawing its accreditation. In justifying its decision, the Alliance pointed out that "the history is significant in terms of the length of time afforded IU to come into compliance with standards, significant in terms of the breadth of the failure throughout the school's programmatic offerings, and significant in terms of the number of students the school failed to serve." J.A. 205.

As to performance, the Alliance noted that even in the latest update, CEHE still "reported below-benchmark rates of student achievement in 82% (14 of 17) programs that are active and have been operational long enough to be reportable." J.A. 210. It also noted that the "school's projections and trend data show that the school's current efforts will not achieve minimum student achievement benchmarks for years." J.A. 213. And it ultimately concluded that, "[b]ased on the length of time the [Alliance] has already afforded the school to make improvements or take programmatic actions, the [Alliance] cannot continue to defer a decision regarding the viability of the school's operations based on projected student achievement rates." J.A. 218.

## B.

CEHE appealed the decision to the Alliance's internal Appeals Panel.

In its appeal, CEHE argued that (1) its efforts to turn IU around were working before the Alliance abruptly withdrew accreditation, (2) the Alliance was not consistently applying its standards across schools, and (3) the withdrawal was a continuation of unnecessarily punitive actions towards CEHE. To supplement its appeal, CEHE asked the Alliance for extensive discovery relating to probationary actions taken against other schools. But the Alliance denied that request, noting that such information was both confidential and irrelevant to whether CEHE was meeting its benchmarks. The Alliance's executive director explained to CEHE that the rules governing the appeals process "make clear that the [Alliance], in making decisions as to any particular school, considers only that school's file." J.A. 257. Still, CEHE found some publicly available probationary letters to other schools and included them in its appeal.

5

The Appeals Panel affirmed the Alliance's decision to withdraw CEHE's accreditation.

The Panel noted CEHE's extensive and pervasive history of failing to meet benchmark rates for graduation and employment. It also rejected CEHE's argument that the Alliance had in any way implied that it would give CEHE several years to remedy the serious issues the commission had identified. Finally, it rejected CEHE's due process argument that the Alliance was treating CEHE differently than other schools, noting that "accreditation decisions are predicated on the individual facts and circumstances pertaining to the institution as contained in the detailed record of actions and communications with the institution under review." J.A. 328.

Following the Appeals Panel's decision, CEHE exercised its right under the Alliance's rules to have the matter reviewed in binding arbitration. Again, CEHE attempted to supplement the record with outside information about the Alliance's treatment of other schools, but the arbitrator denied the request, citing the arbitration agreement.[2] Instead, he affirmed the Appeals Panel's decision based solely on the materials that were before the Panel.

The arbitrator first noted that, under this Court's decision in *Professional Massage Training Center, Inc. v. Accreditation Alliance of Career Schools & Colleges*, the standard of review is quite deferential to the accreditation commission. J.A. 55 (citing 781 F.3d 161,

---

[2] That agreement provides that "[t]he arbiter may not consider evidence that was not in the record before the Appeals Panel." J.A. 115. It also prohibits any adversarial discovery. J.A. 117.

6

171 (4th Cir. 2015)). He rejected the argument that the Alliance and the Appeals Panel "paid no attention to the relative success of [IU]'s recently enrolled students," noting that "the evidence before the Appeals Panel included extensive data" related to past "rates of retention, graduation and employment of IU students" as well as "estimates of projected, future student achievement[.]" J.A. 67–69.

The arbitrator also pointed out an inherent flaw in CEHE's argument. Even though it was true that the recency of CEHE's intervention strategies meant that the Alliance would not see a demonstrable effect on graduation rates for years, an intermediate statistic was quite telling: CEHE's ability to *retain* students from year to year. In other words, if a student dropped out after a single year, they of course would not graduate, meaning the Alliance could see warning signs that CEHE would fail to meet benchmark graduation rates even in spite of its intervention efforts.

In sum, then, the arbitrator found substantial evidence to support the Appeals Panel's decision to affirm the accreditation withdrawal.

But the arbitrator also explicitly considered CEHE's disparate treatment and due process arguments. He affirmed the Appeals Panel's conclusion that "accreditation decisions are predicated on the individual facts and circumstances pertaining to the institution as contained in the detailed record of actions and communications with the institution under review." J.A. 79–80. He also went further, stating, "[i]t would go far outside the defined role of the reviewing tribunal to attempt to compare the propriety of [the Alliance]'s decisions concerning other schools with the propriety of its decisions concerning [IU]." J.A. 80.

7

C.

Having failed before the Appeals Panel and the arbitrator, CEHE turned to federal district court, filing a motion to vacate the arbitration award and a complaint against the Alliance. The complaint brought claims alleging a violation of due process and tortious interference with contract and prospective business or economic advantage. As relevant here, the Alliance moved for judgment on the pleadings pursuant to Rule 12(c).

The district court denied CEHE's motion to vacate and granted the Alliance's Rule 12(c) motion. Without reaching the merits of CEHE's due process argument, the district court found that the parties were bound by the arbitration decision and that CEHE's common law claims impermissibly skirt the confines of the Federal Arbitration Act and therefore constitute collateral attacks on the arbitration award.

CEHE timely appealed to this Court.

II.

We review de novo the decision to grant a motion for judgment on the pleadings under Rule 12(c). *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). The standard of review for Rule 12(c) motions mirrors that of Rule 12(b)(6) motions. *Id.* That is, a motion for judgment on the pleadings "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

8

Similarly, the denial of a motion to vacate an arbitration award is reviewed de novo. *Jones v. Dancel*, 792 F.3d 395, 401 (4th Cir. 2015).

## A.

CEHE first argues that the district court erred in denying its motion to vacate the arbitration award. We disagree.

Judicial review of an arbitration award in federal court "is severely circumscribed." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998). "A court sits to 'determine only whether the arbitrator did his job—not whether he did it well, correctly, or reasonably, but simply whether he did it.'" *U.S. Postal Serv. v. Am. Postal Workers Union*, 204 F.3d 523, 527 (4th Cir. 2000) (quoting *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union*, 76 F.3d 606, 608 (4th Cir. 1996)).

Under Section 10 of the Federal Arbitration Act, a federal court may only vacate the decision of an arbitrator on certain narrow grounds. *See* 9 U.S.C. § 10(a). CEHE presses only one of those statutorily defined grounds for vacatur: that the arbitrator was "guilty of misconduct . . . in refusing to hear evidence pertinent and material to the controversy[.]" *Id.* § 10(a)(3). Specifically, CEHE argues that the arbitrator "denied CEHE an opportunity to present pertinent and material evidence based on" the Alliance's internal rules, "which categorically limited the evidence to only [the Alliance's] record." Opening Br. at 29.

We held in *International Union, United Mine Workers of America v. Marrowbone Development Co.* that an arbitration award may be vacated under the cited prong if the arbitrator "failed to provide the parties with a full and fair hearing." 232 F.3d 383, 388 (4th Cir. 2000). We explained that we must vacate the award "when the exclusion of relevant

9

evidence so affects the rights of a party that it may be said that he was deprived of a fair hearing." *Id.* at 389 (quotation omitted).

CEHE seeks to analogize its case to *Marrowbone*. But this case is not *Marrowbone*.

There, a union filed several grievances against an employer for using non-union employees to do work the union claimed belonged to union employees. *Id.* at 386. That grievance went to arbitration, where the employer prevailed. Later, a union employee filed a different grievance based on a similar argument but alleging different facts about the various union and non-union jobs. Relying on the prior decision, the arbitrator ruled in favor of the employer without a follow-up hearing or reviewing new evidence. We vacated the award, concluding that the arbitrator had denied the union employee a full and fair hearing by not allowing the union employee to present new evidence to demonstrate differences between the first round of grievances and the new one. *Id.* at 389–90.

Here, by contrast, CEHE was given extensive time and runway to present its argument that it had a plan to get IU back on track to meet the Alliance's benchmarks. The Alliance issued three different warning letters in the form of probation letters, which then allowed CEHE to respond with thousands of pages of data in its defense.

Once the withdrawal decision was made, the sole evidence CEHE was not allowed to present was evidence of the terms of other schools' probations. But that evidence was irrelevant—to the Alliance in deciding to withdraw CEHE's accreditation, to the Appeals Panel in affirming that decision, and to the arbitrator in deciding whether substantial evidence supported the Appeals Panel's decision. The excluded evidence was irrelevant to the Alliance and the Appeals Panel because they needed only to determine whether CEHE

was meeting benchmarks and whether good cause existed to extend the time for compliance. And it was irrelevant to the sole question before the arbitrator: Whether the Appeals Panel's decision was supported by the evidence that was in the record when the Panel rendered its decision.

This case is distinguishable from *Marrowbone* in a second important respect: The arbitration agreement in that case did not expressly prohibit the arbitrator from admitting certain evidence. Here, however, the parties' arbitration agreement specifically provides that "[t]he arbiter may not consider evidence that was not in the record before the Appeals Panel," J.A. 115, and that "[d]epositions, interrogatories, requests for admission, and other forms of adversarial discovery shall not be used during the arbitration proceeding," J.A. 117. CEHE does not (and cannot) dispute that the arbitrator, in denying CEHE's discovery requests, merely did what the agreement instructed him to do.

Therefore, it cannot be said that the arbitrator "refus[ed] to hear evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). Accordingly, we affirm the district court's decision to deny the motion to vacate.

## B.

In the same pleading as its motion to vacate, CEHE lodged a complaint against the Alliance, alleging that the withdrawal of accreditation violated its due process rights and tortiously interfered with its contracts and business opportunities.

The district court did not address the merits of the causes of action. Instead, it found that the complaint represented an impermissible collateral attack against the arbitration award and thus entered judgment for the Alliance.

11

We agree and thus affirm.

Though several of our peer circuits have already done so, we have not yet formally adopted the impermissible-collateral-attack rule. We do so today. So we'll first explain the standard under which the arbitrator deferred to the accrediting agency, then lay out the impermissible-collateral-attack rule as articulated by other circuits, and finally use that rule to determine whether CEHE's complaint was merely a dressed-up attempt to vacate the arbitration award. We conclude that it was.

1.

In upholding the Alliance's accreditation withdrawal, the arbitrator relied heavily on the deference we articulated in *Professional Massage*. *See Pro. Massage*, 781 F.3d at 171.

In *Professional Massage*, the Alliance (the same) placed the Professional Massage Training Center ("the Training Center") on probation after an Alliance-led investigation and report identified several areas of concern, including leadership issues, inadequate student performance, and failure to comply with federal financial requirements. *Id.* at 167. The Training Center responded with an improvement plan, which the Alliance evaluated with an on-site visit. *Id.* at 168. The Alliance then issued a second probation order and eventually withdrew the Training Center's accreditation. *Id.*

As here, the Training Center appealed the decision to the Alliance's internal Appeals Panel. However, unlike here, the Training Center did not proceed from there to arbitration. Instead, the Training Center filed suit directly in federal court, alleging due process

12

violations as well as breach of contract and tortious interference with contract and business opportunities. *Id.*

The district court conducted a four-day bench trial and eventually ruled in favor of the Training Center—finding that the Alliance had violated the Training Center's due process rights, awarding the Training Center damages, and reinstating the Training Center's accreditation. *Id.* The Alliance appealed to the Fourth Circuit. *Id.* at 169.

On review, we held that "accreditation agencies are [not] wholly free of judicial oversight" because they, "like all other bureaucratic entities, can run off the rails." *Id.* Thus, there is a federal "common law duty on the part of 'quasi-public' private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members." *Id.* (quotation omitted).

Despite that narrow cause of action, we also held that the accrediting agency's decision should be afforded considerable deference. Courts may not "undertake a wide-ranging review of decisionmaking by accreditation agencies." *Id.* at 170. Instead, the court's focus should be "primarily on whether the accrediting body's internal rules provided a fair and impartial procedure and whether it followed its rules in reaching its decision." *Id.* (cleaned up).

Applying that newly clarified standard, we concluded that the district court had exceeded the scope of judicial review. *Id.* at 172. We noted that the district court had "greatly expanded the administrative record, held a full multi-day bench trial, received depositions and live testimony in a way that sought to make itself the primary investigator and finder of fact, and went far beyond the focus on procedural fairness to refashion the

13

accreditation decision on the merits." *Id.* And we noted that, despite allegations of "disdain" for the Training Center in the record, "there was not sufficient evidence that [the Alliance] was motivated by bias to justify departure from the deferential standard ordinarily due to the accreditation agency under a common law due process claim." *Id.* at 178, 180. "[W]ithout question," we said, "the district court conducted an impermissible de novo review." *Id.* at 172.

But CEHE's claim here strikes us as different in a few important ways.

First, this is a review of a motion on the pleadings, which triggers 12(b)(6) standards, whereas *Professional Massage* came to us after a full-blown bench trial. Though CEHE alleges many of the same types of bias, we would typically be more wary of dismissing those allegations at this stage of the litigation. Second, CEHE alleges more than mere bias: It alleges a complete inability to submit certain evidence about the Alliance's inconsistent application of its standards across schools. Those two distinctions, we think, make this case edge at least a bit closer to the type of due process claim that might survive even under *Professional Massage*.

But the most important difference between this case and *Professional Massage* is that this case involves a second level of deference: to the arbitrator.

2.

The district court never reached the merits of the due process claim. The arbitrator, on the other hand, did.

Citing *Professional Massage* as the standard, the arbitrator agreed with the Appeals Panel that any evidence CEHE sought to bring into the adjudication would have been

14

irrelevant because "accreditation decisions are predicated on the individual facts and circumstances pertaining to the institution as contained in the detailed record of actions and communications with the institution under review." J.A. 79–80. Indeed, it found, "[i]t would go far outside the defined role of the reviewing tribunal to attempt to compare the propriety of [the Alliance]'s decisions concerning other schools with the propriety of its decisions concerning [IU]." J.A. 80.

In other words, the arbitrator considered CEHE's arguments under *Professional Massage* and determined they did not have merit. The district court, in turn, then described all counts in the complaint—the due process claim, as well as the tortious interference claims—as "impermissible collateral attack[s]" on the arbitration. *Ctr. for Excellence in Higher Educ., Inc. v. Accreditation All. of Career Schs. & Colleges*, No. 1:22-cv-1223, 2025 WL 725265, at *7 (E.D. Va. Mar. 6, 2025). The district court was right.

As an initial note, we have never formally adopted the language that the district court used here. But at least the Fifth, Sixth, and Tenth Circuits have rejected complaints that purport to bring independent claims but that instead merely attempt to vacate an arbitration award. *See Texas Brine Co., L.L.C. v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482, 487 (5th Cir. 2020) ("[P]urportedly independent claims are not a basis for a challenge if they are disguised collateral attacks on the arbitration award."); *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906, 910 (6th Cir. 2000) ("[W]here a party files a complaint in federal court seeking damages for an alleged wrongdoing that compromised an arbitration award and caused the party injury, it is no more, in substance, than an impermissible collateral attack on the award itself." (quotation omitted)); *Foster v. Turley*,

15

808 F.2d 38, 42 (10th Cir. 1986) ("When, as here, a suit is in substance no more than a collateral attack on the award itself, it is governed by the provisions of the [Federal Arbitration] Act."). Many district courts agree.[3] In fact, we are not aware of any court that has considered the rule explicitly and rejected it.

We agree with our peer circuits that the impermissible-collateral-attack rule is necessary to fully effectuate the exclusivity of the Federal Arbitration Act, so we adopt it here. As both parties agree, litigants wishing to vacate or modify an arbitration award have an exclusive remedy in Sections 10 and 11 of the Federal Arbitration Act.[4] Conversely, where a claim set out in a complaint purports to evade the Federal Arbitration Act's exclusivity but nevertheless in substance simply asks that the arbitration award be vacated, we will dismiss the claim as an impermissible collateral attack.

In determining whether a complaint is an impermissible collateral attack on an arbitration award or a truly independent cause of action, courts should look to "the

---

[3] *See Vital Pharms. v. PepsiCo, Inc.*, 528 F. Supp. 3d 1295, 1303 (S.D. Fla. 2021) ("[C]ontinuing to press for injunctive relief that is incompatible with the [arbitration order] is in effect executing a collateral attack on that order."); *Nazar v. Wolpoff & Abramson, LLP*, 530 F. Supp. 2d 1161, 1168 (D. Kan. 2008); *Nickoloff v. Wolpoff & Abramson, L.L.P.*, 511 F. Supp. 2d 1043, 1044 (C.D. Cal. 2007) ("Seeking damages in federal court for alleged wrongdoing that compromised an arbitration award is an impermissible collateral attack on the award itself."); *Dalow Indus., Inc. v. Jordache Enters., Inc.*, 631 F. Supp. 774, 779 (S.D.N.Y. 1985) ("[I]f Dalow had a quarrel with the completeness of the award, it should have attacked it directly through a motion to vacate, modify or correct it. It may not here subject the award to collateral attack."). *But cf. Baucom v. Potter*, 225 F. Supp. 2d 585, 593 (D. Md. 2002) (accepting impermissible collateral attack rule but finding the alleged discrimination was not "taken pursuant to a binding arbitration award").

[4] They may also "challenge the underlying contract to arbitrate pursuant to section 2," the FAA's enforceability provision. *Corey v. N.Y. Stock Exch.*, 691 F.2d 1205, 1212 (6th Cir. 1982).

16

relationship between the alleged wrongdoing, purported harm, and arbitration award." *Texas Brine*, 955 F.3d at 488 (quoting *Gulf Petro Trading Co. Inc. v. Nigerian Nat'l Petroleum Corp.*, 512 F.3d 742, 749 (5th Cir. 2008)). Signs of an impermissible collateral attack include "[a]lleging wrongdoing that would justify vacatur," a purported harm that "is the kind of harm appropriately remedied through Section 10 of the [Federal Arbitration Act]," and requested relief that is in essence the relief sought in arbitration. *Id.* at 489; *see Decker*, 205 F.3d at 910 (explaining that an alleged harm that "resulted from the impact of [the alleged wrongdoing] on the arbitration award" must be pursued through a motion to vacate).

Under that rule, we think it clear that CEHE's complaint is an impermissible collateral attack on the arbitration award.

We start with the alleged wrongdoing. The thrust of the alleged wrongdoing in the complaint is that the arbitrator (and the Alliance) refused to consider evidence of the Alliance's disparate treatment. But such a complaint is "squarely within the scope of section 10," *Texas Brine*, 955 F.3d at 489 (quoting *Corey v. N.Y. Stock Exch.*, 691 F.2d 1205, 1212 (6th Cir. 1982)), which allows for vacatur for "refusing to hear evidence pertinent and material to the controversy," 9 U.S.C. § 10(a)(3). Indeed, CEHE stated during oral argument that it "intended those both [the motion to vacate and the complaint] to be kind of one challenge to the process under *Professional Massage*, challenging the procedures that we received." Oral Arg. 5:06–5:16, https://www.ca4.uscourts.gov/OAarchive/mp3/25-1372-20251209.mp3.

17

Next, we look to the purported harm. The purported harms CEHE suffered—including damages, loss of students, and loss of reputation and goodwill—all flowed from its loss of accreditation, precisely the issue in front of the arbitrator.

Finally, we look to the requested relief and its relationship to the alleged wrongdoing and purported harm. CEHE's requested relief includes a declaration that the Alliance's withdrawal was arbitrary and capricious, injunctive relief to reverse the withdrawal decision, prospective injunctive relief requiring the Alliance to adhere to due process, and damages and attorney fees for the Alliance's alleged due process violations. Clearly the core of the complaint's requested relief—an injunction overturning the withdrawal decision—is so intimately connected with the kind of relief one would seek in a Section 10 motion to vacate as to be barred by the impermissible-collateral-attack rule.

But the rest of CEHE's proposed remedies fare no better because they flow from the Alliance's alleged due process violations for failing to consider pertinent evidence in its appeal—exactly the "same wrongdoing" with which the arbitrator already dispensed.[5] *Texas Brine*, 955 F.3d at 490. The arbitrator has spoken on the merits of the Alliance's due process claim; we cannot then defy that conclusion and award supposedly independent damages and prospective injunctive relief stemming from that precise due process claim. *See Corey*, 691 F.2d at 1213 (holding a plaintiff "may not transform what would ordinarily

---

[5] And to the extent CEHE challenges the contractual limitation—as set forth in the arbitration agreement—on the arbitrator's ability to hear evidence, that falls under the purview of Section 2 and would also be an impermissible collateral attack.

18

constitute an impermissible collateral attack into a proper independent direct action by . . . altering the relief sought").

If the complaint is simply a collateral attack on the arbitration, it must be dismissed *in toto*, including both the due process claim and the tortious-interference claims. That means that this Court need not even proceed to the underlying merits of the due process claim—an approach taken by the district court, as well.

Because the district court correctly identified CEHE's complaint as an impermissible collateral attack on the arbitration, we affirm its judgment on the pleadings.

III.

For the foregoing reasons, the district court's judgment is affirmed.

*AFFIRMED*